

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 23, 2022

**BY ECF**
The Honorable Jed S. Rakoff
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    **Re:** *United States v. Jerome Austin*, S2 21 Cr. 652 (JSR)

Dear Judge Rakoff:

  The defendant in this case, Jerome Austin, is scheduled to be sentenced on September 30, 2022, after having pleaded guilty to (i) conspiracy to commit securities fraud, in violation of Title 18, United States Code, Section 371, (ii) conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349, and (iii) making false statements, in violation of Title 18, United States Code, Section 1001.

  The defendant is a serial fraudster who not only spent years conning numerous individual victims but also lied to this Court and took flight from justice. He has demonstrated an almost boundless capacity for duplicity, as well as a lack of remorse for his crimes and the many people he has harmed. For the reasons further detailed below, the defendant's conduct warrants a term of incarceration that falls below the applicable range under the U.S. Sentencing Guidelines ("U.S.S.G." or "Guidelines") but which is nonetheless substantial.

  **I.** **The Offense Conduct and Procedural History**

  The defendant was initially investigated for assisting his friend and co-defendant, Robert Lenard Booth, in an international fraud scheme that preyed on individual investors. Beginning in December 2021, the defendant was questioned by law enforcement agents about his involvement in Booth's scheme. In the months leading up to Booth's trial, the defendant then met with the Government about a dozen times to reap the benefits of a non-prosecution agreement regarding his offense conduct.

  In the middle of the trial during which the defendant was expected to testify, however, the Government learned, through outside sources, that the defendant had lied to the Government by hiding his still-active involvement in a distinct but operationally similar commodities fraud scheme. As part of that scheme, he had received, laundered, and helped redistribute hundreds of

The Hon. Jed S. Rakoff
September 23, 2022

thousands of dollars in victim funds through bank accounts that he personally opened and maintained in coordination with co-conspirators in Costa Rica.

After the Government uncovered the defendant's duplicity and withdrew his non-prosecution agreement, the defendant signed a cooperation agreement with the Government and pleaded guilty to the Information. Ultimately, in light of the defendant's newly uncovered dishonesty, the Government chose not to put him on the stand during Booth's trial. While awaiting sentencing, the defendant was permitted to remain on bond, and in July, he obtained the Court's authorization to visit his daughter in Dallas. He used that travel opportunity to abscond to Jamaica, buying multiple tickets in an apparent effort to confuse and evade law enforcement.

    A.   The Charged Fraud

For years, the defendant assisted his friend and co-defendant Robert Lenard Booth in defrauding victims all over the world. Presentence Investigation Report ("PSR") ¶ 12.

On April 28, 2022, co-defendant Booth was convicted by a jury of participating in an investment fraud scheme that ran from at least June 2019 through August 2021. PSR ¶ 7. The scheme, orchestrated from "boiler rooms" in countries such as Thailand and Panama, involved calling potential investors around the world and using high-pressure tactics and elaborate deceptions—such as fake brokerage websites, corporate email accounts, and contracts—to trick the investors into wiring tens or hundreds of thousands of dollars in exchange for what the victims believed to be legitimate securities. *Id.* ¶¶ 12-13. In fact, the funds were directed to shell company accounts used by the conspirators to launder the fraud proceeds and to distribute them among the conspirators through transactions designed to resemble legitimate business payments. *Id.* ¶ 13.

The defendant wore many hats in Booth's boiler room scheme, ultimately helping the defendant cause losses of at least $2 million. The defendant's work in Booth's boiler rooms began in or around 2016, when the defendant started editing and revising Booth's websites, working to make Booth's fake brokerage websites appear more credible so as to more effectively deceive victims into believing they were purchasing stocks from legitimate companies. *Id.* ¶ 21.

Over time, the defendant's participation in the scheme expanded. Beginning in around late 2018, the defendant worked as a "fronter" or an "opener" who called and pitched victims in Canada and elsewhere, personally lying to them about representing brokerage firms and gaining their trust in order to persuade them to purchase purportedly discounted stocks. *Id.* ¶ 21. Recordings of the defendant's calls with victims—which the defendant sent to Booth as proof of his work and which were recovered from Booth's phone and introduced at Booth's trial—show the defendant aggressively pitching victims, pressuring them to invest significant sums while stock prices were purportedly low. *Id.* Once a victim expressed willingness to make a purchase, the defendant would put them in touch with a senior advisor—Booth—and the victims were given wiring instructions to make their payments. *Id.*

Whereas Booth communicated directly with money launderers involved in the scheme, and collected hundreds of thousands of dollars in his personal bank accounts, the defendant received relatively small payments from Booth. All told, between 2016 and 2021, in a combination of

The Hon. Jed S. Rakoff
September 23, 2022

Western Union payments and wire transfers, the defendant was paid approximately $66,166 by Booth.[1]

### B. The Defendant's Attempted Cooperation with the Government

During the Government's investigation of Booth, the defendant was identified as a caller who worked for Booth. The defendant was first approached by federal agents when he flew into the United States, from Panama, in December 2021. The defendant retained counsel and agreed to meet with the Government, pursuant to a proffer agreement, to discuss his involvement in Booth's investment fraud scheme. After a few meetings, the defendant was unable to pay for counsel, and the Government arranged for the appointment of counsel to represent the defendant in his continued meetings with the Government. During those meetings, the defendant was repeatedly reminded that he was required to tell the whole truth about his involvement in the scheme and his participation in any other criminal activity.

In the course of about a dozen calls and meetings with the Government over three months, the defendant detailed at length his relationship with Booth and the inner workings of Booth's boiler room, providing information that was corroborated by a mountain of other evidence confirming the defendant's, and Booth's, guilt—including highly incriminating photographs, text messages, audio recordings, wiring instructions, and victim information recovered from Booth's own phone; cooperator testimony from Booth's main money launderer; and voluminous records from the banks through which the scheme laundered victim proceeds. While by no means necessary in proving the Government's case against Booth, the defendant's information assisted the Government in building a more complete picture of some of the day-to-day operations of the fraud and the nature of Booth's interactions with and reliance on his co-conspirators.

While providing truthful and corroborated information about Booth's scheme, the defendant also attempted to minimize his own involvement in the scheme. The defendant initially admitted only that he had made calls to individual investors that started in 2018, and he denied earlier involvement in the scheme. It was only when confronted with Western Union payments dating back to 2016 that he conceded his involvement in other activities for Booth's boiler room, including visiting Thailand as early as 2016 to assist Booth in his operations and extensively editing and revising the fraudulent websites and paperwork that Booth needed to attract victims. Based on the information the defendant provided about the overall scheme, his role in the scheme relative to Booth, and importantly, the defendant's assertion that he was not involved in other criminal activity, the Government offered the defendant a non-prosecution agreement, which the defendant signed on April 13, 2022.

Booth's trial began on April 18, 2022. The defendant was slated to testify on the second day. But on the morning of his expected testimony, the Government received reports about Panamanian bank accounts that the defendant had failed to disclose during his prior meetings with the Government. The records indicated that the defendant's Panamanian accounts were shell

---

[1] Western Union records show that Booth, or a co-conspirator working at Booth's direction, paid the defendant, or someone receiving money on the defendant's behalf, approximately $57,866 between 2016-2021. An additional $8,300 was sent by bank wire.

The Hon. Jed S. Rakoff
September 23, 2022

company accounts used as part of an investment fraud scheme to receive and launder victim payments for fake commodities futures contracts. *Id.* ¶ 29. The scheme had no apparent connection to the scheme on trial or to Booth.

The Government immediately disclosed information about the accounts to Booth's defense counsel, as well as the defendant's counsel, and withdrew the defendant's non-prosecution agreement. The Government met again with the defendant to discuss this scheme. During this meeting with the Government, the defendant described his participation in the commodities fraud scheme from at least 2016 to 2021 and provided details that indicated it operated similarly to, but was distinct from, Booth's boiler room. The defendant described his role in the scheme as evolving over time from a caller, to a manager of other callers, to a "banker" (i.e., money launderer). The defendant admitted that beginning in or around 2020, his corporate bank accounts in Panama were used to launder proceeds of the scheme, and he estimated that $800,000 to $1 million of victim payments had been sent to his accounts. The defendant also disclosed that he had received payments from this scheme throughout early 2022, at the same time he was meeting with the Government, and that his cut was about 10 percent of the total victim money paid into his accounts. The defendant was asked whether he had received any of his payments by way of bank accounts in the United States, and he denied having done so.

After the defendant *again* promised that he had disclosed all of his criminal conduct, he pleaded guilty to the Information, which included a count for making false statements to federal agents regarding the extent of his participation in schemes to defraud investors in connection with the sale of securities and commodities. *Id.* The plea was entered pursuant to a cooperation agreement, in which the defendant confirmed that he had fully disclosed his participation in Booth's boiler room scheme, as well as his participation in the separate commodities scheme.[2] In light of the defendant's dishonesty about the second scheme, and his clear participation in that scheme even while meeting with the Government for months regarding his criminal activities with Booth, the Government did not call him as a witness at Booth's trial.

After Booth's conviction on all counts, the Government met with the defendant several more times to investigate the commodities scheme in which the defendant had participated for years and for which the defendant had laundered victim funds through Panamanian shell company accounts. The defendant provided additional information about his role in the scheme and the boiler room operations run by his co-conspirator in Costa Rica. The defendant also provided information in response to the Government's questions about specific Panamanian bank accounts

---

[2] The cooperation agreement obligated the Government to file a motion pursuant to U.S.S.G. § 5K1.1 if the Government determined that the defendant has provided substantial assistance in the investigation or prosecution and has fully complied with the understandings specified in the cooperation agreement. The Government has declined to file such a motion here because the defendant has done neither, as explained in greater detail herein. The defendant's cooperation does not form the basis for the Government's request for a below-Guidelines sentence. The request merely reflects the Government's assessment of what would be appropriate and equitable under Section 3553(a) factors and in light of the defendants' relative culpability for the charged fraud scheme.

4

The Hon. Jed S. Rakoff
September 23, 2022

that the defendant had opened and maintained for fraud purposes and provided the Government with certain bank records.

In the course of those meetings, however, the Government learned that, prior to signing his cooperation agreement with the Government, the defendant had made multiple omissions or told outright lies about his involvement in the scheme. First, the Government discovered that in April, when the defendant had been initially confronted with evidence of his involvement in the commodities fraud scheme, the defendant had called his co-conspirator in Costa Rica about the Government's inquiries, a fact he had not disclosed. Second, the Government discovered that, contrary to the defendant's claim that he had not received payment for the commodities fraud scheme through any U.S. bank accounts, the defendant maintained a bank account in the United States that he had in fact used to receive approximately $58,000 of proceeds from the fraud scheme.

On the Government's instructions, as part of an effort to cooperate and provide the Government actionable information in accordance with the cooperation agreement, the defendant again contacted his co-conspirator and attempted to engage him. These efforts proved unfruitful.

### C. The Defendant's Lies to the Court and Flight from Justice

After the defendant pleaded guilty to the instant offenses, he remained on release. The terms of his release included a $250,000 unsecured bond, with his children serving as cosigners, and standard conditions, such as the surrender of all travel documents and restrictions on his travel. On July 1, 2022, the defendant, through defense counsel, sought permission from the Court to travel from the District of Connecticut to the Northern District of Texas on July 7 "to assist his daughter, who resides in Dallas, Texas, through a family matter." ECF No. 103.

While the defendant sought and received approval to fly domestically, law enforcement obtained information that suggested the defendant had booked simultaneous domestic and international travel. Specifically, on June 30, 2022, Homeland Security Investigations ("HSI") received an alert that the defendant had booked a ticket for a June 29 flight from JFK Airport to Kingston, Jamaica but had not boarded the flight. PSR ¶ 30. On July 7, 2022, HSI learned that the defendant was booked for both a July 7 flight from JFK to Dallas, in accordance with his travel authorization from the Court, but also a July 8 flight from JFK to Kingston. *Id.* In light of this information, HSI coordinated with Customs and Border Protection ("CBP") to verify the international booking, and on July 7, a CBP agent went to JFK Airport and waited at the gate to ensure the defendant boarded his Dallas flight.

In the course of that wait, law enforcement learned of the defendant's elaborate deceit: the defendant had checked in for his July 7 domestic flight, but once past airport security, he had gone to a ticket counter and exchanged his July 8 ticket to Kingston for a July 7 ticket to Kingston. *Id.* ¶ 31. He successfully boarded the Kingston flight and was in the air to Jamaica before law enforcement was able to confirm with a ticket agent that the defendant had pulled off a same-day ticket exchange. The Government later learned that the defendant had boarded the flight to Jamaica with a recently expired Jamaican passport that he had never disclosed or surrendered as required by his conditions of release. *Id.*

5

The Hon. Jed S. Rakoff
September 23, 2022

The next morning, on July 8, 2022, the Court issued a warrant for the defendant's arrest based on flight from the United States, and the Government moved to obtain a provisional arrest warrant in Jamaica. *Id.* ¶ 32. Meanwhile, HSI agents stationed in Jamaica surveilled the defendant in Kingston after he landed and observed him converting currency. They also overheard him discussing getting a rental car and stating that he did not want to pay with a credit card. *Id.* The agents further learned that the defendant had applied for an emergency passport, indicating that he intended to travel from Jamaica to another country. But before he could obtain the passport, the defendant was detained by local authorities. He was released on July 11, 2022, and again went to the passport office, where he was arrested on a request made by the Government to facilitate his extradition to the United States. *Id.* ¶ 33. Based on the defendant's actions, and given his ties to Panama and other Central American countries, the Government believes that the defendant was attempting to flee prosecution and sentencing by traveling onward from Jamaica.

The defendant waived extradition to the United States and was returned to New York on August 18, 2022. On August 19, 2022, the defendant consented to the revocation of bail, and U.S. Magistrate Judge Barbara Moses ruled that there was no condition or combination of conditions that would assure the defendant would not flee if released. *Id.*

## II.     The PSR

On September 22, 2022, the U.S. Probation Office issued a PSR dated September 16, 2022. The report calculated an applicable Guidelines range of 108 to 135 months' imprisonment based on an offense level of 31 and a criminal history category of I. PSR ¶¶ 48, 51. The Guidelines range includes a 16-level enhancement pursuant to U.S.S.G. § 2B.1.1(b)(1)(I) for causing victim loss of at least $1.5 million; a four-level enhancement pursuant to § 2B.1.1(b)(2)(B) because the offense resulted in substantial financial hardship to five or more victims; a two-level enhancement pursuant to U.S.S.G. § 2B.1.1(b)(10)(B) because a substantial portion of the offense was committed from Thailand and Panama; a two-level enhancement pursuant to U.S.S.G. § 3C1.1 for obstruction of justice, in light of the defendant's false statements to law enforcement and flight; and no credit for acceptance of responsibility. PSR ¶ 35-48.

Probation recommends a sentence of 108 months of imprisonment (60 months on Counts One and Three and 108 months on Counts Two, with all terms to run concurrently) and three years' supervised release. *Id.* at 20. Probation recommends no fine but restitution of at least $1.5 million, based on the amount of victim loss for which he and Booth are together responsible for causing, and the mandatory of special assessment of $300. *Id.*

## III.    Discussion

The defendant faces an applicable Guidelines range of 108-135 months' imprisonment. A sentence that is lower than that range, but which is nonetheless substantial, is warranted for the defendant, who, as Probation observes, does not face time for "an isolated incident of poor judgment." PSR at 21.

The defendant harmed numerous victims through his participation in the instant fraud. Despite being provided an alternative to prosecution, he then repeatedly obstructed the

6

The Hon. Jed S. Rakoff
September 23, 2022

administration of justice. He was continually reminded that he was required to be completely truthful in his meetings with the Government, and he was afforded every opportunity to be fully honest about his conduct. Instead, he chose to lie at every turn, meeting with the Government for months while simultaneously laundering funds and pocketing victim proceeds in a wholly unrelated and yet very similar scheme. When his lies caught up with him and resulted in the withdrawal of his non-prosecution agreement, he resorted to perpetrating a fraud on the Court, using an authorized visit to his daughter in Texas as an excuse to travel to the airport, where he swapped tickets and hopped a flight out of the country. Under these circumstances, the Section 3553(a) factors weigh in favor of a significant term of incarceration. *See* 18 U.S.C. § 3553.

### A. The Need for a Significant Sentence

*First*, a significant sentence is necessary to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment. *See* 18 U.S.C. § 3553(a)(2)(A). The charged fraud conduct is egregious and speaks to the defendant's abject greed and disregard for the people he harmed. For years, the defendant worked with co-defendant Booth to defraud unsophisticated investors and other vulnerable victims. That is, he systematically defrauded individual people, making his way through literal lists of potential targets and building relationships with them in order to deceive them. *See United States v. Gupta*, 904 F. Supp. 2d 349, 352 (S.D.N.Y. 2012) (JSR), *aff'd*, 747 F.3d 111 (2d Cir. 2014) (distinguishing between working an unfairness on innocent investors and defrauding investors, and disapproving loss amount where the defendant "did not share in any direct sense").

Because the defendant recorded a number of his calls with the prospective investors and those recordings were recovered from Booth's phone, there is no question that the defendant played a direct and disturbing role in manipulating victims into making payments. As reflected in the impact statements provided by the victims in this case,[3] the harm that the victims suffered as a result of the fraudsters' manipulations cannot be measured in dollars alone. One testifying witness at the *Booth* trial lost approximately half a million dollars to the scheme and in his letter to the Court details the devastation of losing almost everything he had saved for 30 years: "The holiday[]s I had planned, businesses I wanted to build, a family home I wanted to buy, are now not possible." Ex. A at 4. And the harm is ongoing. The same victim describes "the emotional impact of this crime, the invasion of my past and indeed the theft of my future" as "something I have to confront every single day." *Id.*

Although less culpable than his co-defendant Booth,[4] who masterminded the securities scheme, the defendant was, by his own admission, an active participant and put his diverse skills to work, serving as a caller, salesman, writer and editor. Further, the tactics deployed by the defendant to perpetrate his fraud maximized these victims' financial and emotional damage: he and his co-conspirators established personal relationships with the victims through months or even years of phone calls in order to persuade them to make payment after payment, often resulting in

---

[3] The victim impact statements submitted to the Court in redacted form in connection with the sentencing of co-defendant Robert Lenard Booth and are being re-submitted as Exhibit A.
[4] On August 11, 2022, the Court sentenced Booth to a 120-month term of incarceration.

7

The Hon. Jed S. Rakoff
September 23, 2022

a single victim's loss to the tune of tens or hundreds of thousands of dollars. *See, e.g.*, Tr. 61. In this way, the scammers destroyed their victims' prospects of recovering from the fraud.

For example, a second victim of the scheme, who is a disabled grader and tallyman living on worker's compensation, testified that he not only wired all of his savings to the fraudsters who ran the Beekman Securities website and related websites, but also spent a month arranging a loan and putting a lien on his property in order to make an additional $110,000 investment. Tr. 420, 722. The havoc the defendant wreaked on his victims' lives was more than financial, as the scheme caused immense psychological and emotional harm from which the victims are still recovering. This is a case in which "the 'utterly despicable' way [the defendant] preyed on unsophisticated investors" should be factored into the sentence. *United States v. Jaramillo*, 754 F. App'x 61, 62 (2d Cir. 2019) (affirming above-Guidelines sentence in commodities fraud and wire fraud case); *United States v. Schlisser*, 767 F. App'x 69, 72 (2d Cir. 2019) (affirming above-Guidelines sentence more than twice the high end of the applicable range based in part on the financial hardship the defendant caused his victims).

*Second*, a substantial sentence is necessary to reflect the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1). The defendant's criminal activities extend well beyond the charged scheme. As the Government learned mere hours before putting the defendant on the stand, while preparing to testify against his co-conspirator in a boiler room fraud, the defendant was actively involved in another fraud involving a wholly different set of co-conspirators. These facts make clear that the defendant is no dupe. That is, he cannot credibly portray himself as an impressionable man who was briefly persuaded by his longtime friend to participate in a single fraud, and he cannot cast his participation in the instant scheme as a mere anomaly. His sentence should reflect his deliberate and repeated efforts to deceive victims—and, when he was caught, his repeated efforts to deceive the Government and even this Court. *See United States v. Kaziu*, 559 F. App'x 32, 39 (2d Cir. 2014) ("[L]ack of remorse for, or even appreciation of, the seriousness of the totality of [the defendant's] conduct . . . further expand[s] the range of substantively reasonable sentences to allow the district court to afford adequate specific deterrence and protection of the public." (quoting *United States v. Broxmeyer*, 699 F.3d 265, 295 (2d Cir. 2012)); *United States v. Agostini*, 365 F. Supp. 2d 530, 540 (S.D.N.Y. 2005) (concluding the defendant's "little remorse" and failure to accept responsibility for his crimes signify "a lack of respect for the law sufficient to justify a significant term of imprisonment).

The defendant's duplicity is not confined to the two fraud schemes. For instance, after the defendant learned that the Government had obtained information about his Panamanian bank accounts, he met with the Government ostensibly to fully disclose his participation in the second commodities fraud scheme and to salvage the benefits of cooperation. But the defendant failed to inform the Government that earlier that day, the defendant had called his co-conspirator in Costa Rica to let him know that the Government had caught wind of their activities. Only after Booth's trial concluded and the defendant had pleaded guilty pursuant to a new cooperation agreement did the defendant disclose his call to his co-conspirator.

In smaller but nonetheless notable ways, the defendant has demonstrated his willingness to lie and withhold material information. In this way, the defendant has not only undermined the Government's ability to fruitfully investigate his co-conspirators but has also hobbled the

8

The Hon. Jed S. Rakoff
September 23, 2022

Government's ability to recover victim funds. For instance, after Booth's trial, the Government noticed a bank application on the defendant's phone, for an entity for which the defendant had never disclosed the existence of any personal accounts. Upon accessing the account, the Government discovered that, in connection with the undisclosed commodities fraud scheme, the defendant had secreted tens of thousands of dollars in victim funds for his personal use. In a subsequent proffer, the defendant admitted that he withheld information about the bank account from the Government in hopes that it wouldn't be found.

*Third*, a substantial sentence is necessary to incapacitate the defendant and to afford adequate deterrence to the defendant and others similarly situated. *See* 18 U.S.C. § 3553(a)(2)(B). Achieving a deterrence effect is particularly important here, where there is plainly no end point to the defendant's duplicity when it comes to hiding and obscuring his culpability. Even being overtly investigated and questioned about federal crimes for his participation in one scheme did not stop the defendant from continuing to launder victim funds in connection with the second scheme. Moreover, it is now clear that the defendant's deceptions started as early as his initial arrest and release on bail, when the defendant deceived the Court, the Government and Pretrial Services by failing to surrender his Jamaican passport.

After his dishonesty cost him his non-prosecution agreement and his own ability to fruitfully cooperate, the defendant resorted to lying to the Court to obtain the opportunity to use that passport to flee justice. The defendant chose to become a fugitive of the law rather than face the consequences of his conduct. Against this backdrop, a substantial prison sentence is necessary to deter the defendant from simply returning to a life built on preying on others upon his release and to dissuade other would-be fraudsters and fugitives from exploiting vulnerable victims and betraying the trust of the Court.

### B. Forfeiture and Restitution

The defendant's conviction, in addition to demanding a significant sentence of imprisonment, requires the Court to impose orders for forfeiture and restitution. *See* 18 U.S.C. §§ 981, 982, 3663, 3663A; 28 U.S.C. § 2461(c). The Court should impose a money judgment against the defendant in the amount of $66,166, representing the proceeds he obtained from the fraud scheme to which he pleaded guilty.

Additionally, the Court must order the defendant to pay restitution to his victims for the losses that he and his co-conspirators caused. *See United States v. Moss*, No. 17 CR. 675 (JSR), 2021 WL 3222514, at *2 (S.D.N.Y. July 29, 2021). Here, that requires an order for restitution in the amount of $2,003,883. This amount is equal to the losses suffered by victims of Booth's and the defendant's fraud scheme, as reflected from the documents and testimony at trial and captured in the proposed restitution schedule that will be submitted under seal.

The Hon. Jed S. Rakoff
September 23, 2022

**IV.     Conclusion**

      For the reasons set forth above, the Government respectfully submits that a significant sentence of imprisonment would be fair and appropriate in this case.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:            /s/          
      Andrew Jones
      Jane Chong
      Assistant United States Attorneys
      (212) 637-2249/2263

cc: David Esseks, Esq., and Melinda Boothe, Esq., counsel for defendant (by CM/ECF)